WALTER VAN DUSEN, Appellee, v. ELVIRA VAN DUSEN SHARRAR et al., Appellees; MARY VAN DUSEN JACOBS, Cross-petitioner, Appellant.

**DEEDS:** Estates and Interests Created—**Rule in Shelley's Case.** The 1 Rule in Shelley's Case is that, where a freehold for life only is created by a deed, and in the same instrument a limitation on the freehold, by way of remainder, is made to grantee's heirs, the limitation to the heirs is void, and the instrument entitles the grantee to the fee.

**DEEDS:** Construction and Operation—**"Heirs" Construed.** Rules 2 of construction are to be used to aid in determining the grantor's meaning; and where a deed conveyed land to grantor's son for the son's lifetime, and then to his heirs, if he had any, and provided that, if he had no heirs, the land was to fall back into the original estate, the word "heirs" is construed, in view of the language used and the surrounding circumstances, to mean "children," and not to be within the Rule in Shelley's Case.

**ADVERSE POSSESSION:** Nature and Requisites—**Proof.** To establish 3 title by adverse possession, it must be shown that, at the time of taking possession, there was a claim of right in good faith, and that the land was occupied openly and adversely for the statutory period; or that the instrument under which title is claimed itself gave color to title, and that the occupant believed that it gave title, and so occupied the land in good faith, and for the statutory period.

**ADVERSE POSSESSION:** Nature and Requisites—**Life Tenant—** 4 **Knowledge and Want of Good Faith.** A grantee who knew that

her grantor had only a life estate in the premises did not secure title by adverse possession through occupancy after her grantor's death.

*Appeal from Crawford District Court.*—M. E. HUTCHISON. Judge.

July 7, 1919.

ACTION in partition. Mrs. Jacobs, one of the defendants, and also intervener, claims to be the absolute owner of the property sought to be partitioned, under the Rule in Shelley's Case. The opinion states the facts. The application of the Rule in Shelley's Case was denied to Mrs. Jacobs. She appeals.—*Affirmed.*

*J. J. Stewart* and *Killpack & Northrop,* for appellant.

*P. J. Klinker,* and *Sims & Kuehnle,* for appellee.

GAYNOR, J.—This case involves the Rule in Shelley's Case. The record shows that, on the 17th day of December, 1879, one Stephen Van Dusen was the owner of certain land, and on that day executed the following instrument, which is the subject-matter of this controversy:

"The grantor, Stephen Van Dusen, and Nancy Van Dusen (his wife), of the town of Wysox in the county of Carroll, state of Illinois, 'for and in consideration of one dollar in hand paid, convey and warrant to Marvin Van Dusen, of the county of Crawford and state of Iowa, the following described real estate, to wit: The west half of the southwest quarter and the southwest quarter of the northwest quarter of Section 25, Range 38, Township 83, containing 120 acres, more or less.

"The condition of the above deed is that I, Stephen Van Dusen, and Nancy Van Dusen, deed the above-described land to the said Marvin Van Dusen his lifetime and if the said Marvin Van Dusen *has eney heirs after his death is to*

*fall to his heirs* and if no *heirs to fall back to the original estate,* situated in the county of Crawford in the state of Iowa, hereby releasing and waiving all rights under and by virtue of the homestead laws of this state.

"Dated this 17th day of December, A. D. 1897."

At the time of the execution of this instrument, Stephen Van Dusen had eight children living, five daughters and three sons. The grantee named in this deed was the eldest of the family, unmarried, and of a roving disposition, developing, later in his life, to some extent, the characteristics of a spendthrift. On the same day that he executed this deed, he also executed a deed conveying to his daughter, Mary Jacobs, the claimant herein, 8 acres. This deed contained exactly the same limitations upon her right and title as are found in the deed above set out. On the 30th day of January, 1880, about six weeks after the making of the deed under consideration, he made another deed to one of his daughters, Sarah Ellen Allison, of 100 acres. It contained also the same qualifications and limitations found in the deed in question. On the 12th day of February, 1880, about 12 days following the execution of the deed to Sarah Ellen, he made a deed to his daughter Elvira Sharrer of 80 acres, with exactly the same limitations. At the time the deed was made to Elvira, she had two children living. At the time the deed in question was executed, the father and mother of Marvin were living, also seven brothers and sisters, and at least two nieces and nephews, all of whom were in the line of heirship, and all but the father and mother with expectancy greater than Marvin's. On December 30, 1885, Marvin Van Dusen quitclaimed 80 acres of the land described in the deed hereinbefore set out to his sister, Mary Jacobs, and on the 17th day of April, 1886, made another quitclaim deed, conveying to her the other 40.

This action is brought in partition, and it is the claim of the plaintiff that Marvin Van Dusen took only a life

estate in the property, and that, upon his death, without children (for he had no children), the property passed to Stephen's estate, under the terms of the deed, and is to be divided and distributed according to the law governing the distribution of the estates of deceased persons; and that each of the living children is entitled to this proportionate share, and the children of the dead brothers and sisters to the share of the dead one.

It is the contention of Mrs. Jacobs that Marvin took an absolute title, under the Rule in Shelley's Case; that the deed conveyed a life estate to him and remainder over to his heirs; and that this, under the Rule in Shelley's Case, vested in him the fee.

It will be noted, from an examination of the instrument itself and its wording, that it is inartistically drawn, and is the product of one unskilled in conveyancing, and unskilled in the use of technical terms. The deed, on its face, conveys certain real estate to Marvin for life; the remainder is subject to conditions. The condition should be read and punctuated as follows:

"The condition of the above deed is that I, Stephen Van Dusen, and Nancy Van Dusen deed the above-described land to Marvin for his life, and, if said Marvin has any *heirs*, then, after his death, the land conveyed is to pass to these *heirs*. If he has no heirs at the time of his death, then the land conveyed is to fall back to the original estate."

The question that here presents itself is: What did he mean when he said that, if Marvin has any heirs, then, after his death, it is to fall to his heirs, and that, if he has no heirs, it shall revert to the original grantor?

1. DEEDS: estate and interests created: Rule in Shelley's Case.    The Rule in Shelley's Case is simply that, where a freehold for life only is created by a deed, and in the same instrument limitation on the freehold, by way of remainder, is made to his heirs, the limitation to the heirs is

void, and the instrument entitles the grantee to the fee. This rule is obsolete in most of the states, and has been repealed in this state. The questions for consideration, however, came into existence before the rule was repealed, and said rule was in force at the time the rights herein asserted accrued. Therefore, we have to deal with it in this case. Unquestionably, the word "heirs" has

2. DEEDS: construction and operation: "heirs" construed.

a definite and a legal signification and meaning. It is a technical word, and, when unexplained and uncontrolled by the context, is usually interpreted according to its strict technical meaning; and if it cannot, under any fair construction, be given other than its technical meaning, —if no other meaning can be gathered from it than the technical meaning, after a consideration of the whole purpose and intent of the grantor, as expressed in the instrument,—it will be given its technical meaning. But if, from the language used in the instrument and the circumstances attending its execution, it is apparent that the maker used the word "heirs" in the sense of children, it will be construed to mean children. The meaning will be given to the word which the grantor intended it should have. Even where the grantor uses the word "heirs," if, by other words, it is made manifest that he intended, in the use of the word "heirs," children, the intention will be made effectual by construing the instrument accordingly. See *Harris v. Brown*, 184 Iowa 1288.

No good purpose could be served by entering upon a discussion of the origin, scope, and purpose of this Rule in Shelley's Case. It has been fully considered by this court before, and in many cases. *Doyle v. Andis*, 127 Iowa 36; *Alt v. Young*, 181 Iowa 1260; *Brown v. Brown*, 125 Iowa 218, 221; *Westcott v. Binford*, 104 Iowa 645; *Ault v. Hillyard*, 138 Iowa 239. If we were to give to the word "heirs" its technical meaning, then the contention of Mrs. Jacobs

is right, and, under the Rule in Shelley's Case, Marvin, from
whom she acquired title, took the fee.  But if, from a con-
sideration of the whole instrument and all the facts and
circumstances attending its execution known to the grantor
and grantee, it is apparent that, in the use of the technical
word "heirs," he meant children, and intended, by the in-
strument, that a life estate only should pass to the grantee,
and the remainder to his children, then the Rule in Shel-
ley's Case does not apply; for, under such circumstances,
the children became vested with the remainder, if there were
any living, and if none were living, and none came into
existence, then it reverted to the grantor, as provided in the
instrument.

It is true that the intention of the testator must be
made manifest and certain.  It is a matter of common
knowledge that persons unskilled in the use of technical
terms, ignorant of the law's refinement in the use of words,
do, when referring to a man's heirs, have in mind the heirs
of his body—his children.  Unlearned and unskilled men
would so use it.  It is apparent that it was his intention to
give to Marvin and these other children to whom he made
deeds a life estate only.  He must have had a purpose in so
limiting the rights of the grantees.  This purpose is mani-
fest only when we limit the remainder to the children of
the grantees named.  We say this because it is not consonant
with reason that this grantor, Stephen, then under 60 years
of age, with a wife living, and undoubtedly younger in
years than he, with seven children living, many of whom
had already borne children, would have in mind, at the time
he executed this deed, that there ever could be a time when
Marvin, who was older than all the other children, with
shorter expectancy of life, should outlive them all, and die
without heirs.  All were in the line of heirship at the time
this deed was made.  Marvin, however, was unmarried.  He
had then no children; and it is consonant with reason that

the grantor should anticipate and provide for the contingency that Marvin might die without issue, and that, upon his so dying, the property would pass back to the estate from which it came, and be distributed among the brothers and sisters of Marvin, the heirs of Stephen, practically in the same way that it would pass, except for the rule invoked by Mrs. Jacobs. Whether the word "heirs," used in this instrument, is used in its technical sense, or in a limited, restrictive, and untechnical sense, is a matter of construction. The correct solution of the problem is made primarily from a consideration of the terms of the grant, and from its wording. Whether the word "heirs" is used in one sense or the other, in its technical sense or as a mode of indicating some distinct persons, such as children, must be determined from the whole record. We know words are not always used in their technical sense. We know that often words which have a technical meaning in law are not used by the unlearned in a technical sense. As said in one case, "to insist that men shall use words in one sense only would be monstrous tyranny." The sense in which words are used must often be determined by the circumstances attending their use, by a consideration of all the facts and circumstances that were in the mind of the maker of the instrument at the time the words are used, and from a fair consideration of the thought he intended to convey, together with the purpose he intended to accomplish by the use of the words. It is rare that two cases are so exactly alike that the interpretation of the language used in one case requires the same interpretation in the other case. The language used and the circumstances which attended the making of the instrument, the purpose to be accomplished by the instrument in which the words are used, serve to distinguish one case from another, and no general rule of interpretation can be adopted that controls **all cases.**

In this case, it appears certain that the intention of the

testator was to give Marvin only a life estate, and that his
*heirs* were intended to take after him. That was clearly his
intent. The only question is: What did he mean by the
word "heirs?" If he meant "children," then, under the
Rule in Shelley's Case, his evident purpose is made effectual.
If we give the word "heirs" its technical meaning, his evi-
dent purpose is defeated because of the Rule in Shelley's
Case, of which, undoubtedly, the old man had no knowledge.
It steps in and destroys and makes ineffectual the very pur-
pose and intent, as expressed in the instrument. In many
cases, there have been such words of limitation upon the
right that, although the word "heirs" is used as used in this
case, the Rule in Shelley's Case has been refused. The in-
tention is the point in dispute, and this intention must be
made effectual, unless, by the application of the Rule in
Shelley's Case, title, by operation of law, passed through
the instrument other than as intended by the grantor. Of
course, no matter what the intention of the testator may
have been, if he has used such words and has so expressed
himself that, construing the words used, his intent is made
clearly manifest, canons of construction will not be per-
mitted to destroy or make ineffectual his clearly expressed
purpose and intent; otherwise, there would be great un-
certainty in the passing of title by written instruments.
Canons of construction are used as aids to the judicial mind
in gathering the true purpose, intent, and meaning of the
grantor expressed in the instrument, and not to thwart it.

This record makes manifest the mind of the grantor,
and his understanding of the meaning of the words used in
the making of the instruments through which he undertook
to convey title to certain of his children. All these instru-
ments had the same limitations that we find here, and all
were made about the same time. At the time he made his
deed to his daughter Elvira, he said to her, when he gave
her the deed:

"Here is your deed to the land. If you like it, take it. If you don't like it, give it back. You will never get it any other way. I deed this to you for life, as I deeded all the others; and at your death, it will go to your children if you have any." (She testified she had two children at the time.) He said: "This will go to your children. If you leave no children, it goes back to the rest of my children; goes back to my estate. You have children; so your children will get this. I am not only looking out for you, but I am looking out for your children afterwards."

She testified that he made this remark touching the disposition of his property in the presence of many of the children; that it was generally understood in the family. The conduct of Marvin after he received the deed clearly indicates to us that he understood that he had only a life estate in the land, and that this was known to Mrs. Jacobs at the time she made her purchase. So we say that the Rule in Shelley's Case does not apply to the facts developed in this record; that Marvin did not take more than a life estate in the property; that he died without children; that it reverted to Stephen and his heirs; and in this partition suit, distribution should be made accordingly.

Some claim is made that Mrs. Jacobs is entitled to hold the property by adverse possession. She never acquired any title or right to this property, except through the deed to Marvin. This deed conveyed only a life estate. A reading of this record convinces us that she knew, when she took the deed, that Marvin had only a life estate. To make adverse possession ripen into a fee, one of two things must appear: That the person claiming by adverse possession, at the time of taking possession, claimed a right to the thing which is the subject-matter of the possession; that he did this in good faith, occupied it openly and adversely for the statutory period. To make title ripen by

3. ADVERSE POSSESSION: nature and requisites: proof.

adverse possession under color of title, it must appear that the instrument itself gave color of title; that the occupant believed the instrument gave title, and so occupied the land, in good faith, for the statutory period. This feature of the case is controlled by what we said in *Harris v. Brown,* 184 Iowa 1288.

4. ADVERSE POS-
SESSION:
nature and
requisites: life
tenant: knowl-
edge and
want of good
faith.

We think the court was right in its holding, and the cause is, therefore,—*Affirmed.*

LADD, C. J., WEAVER and STEVENS, JJ., concur.