IN RE ESTATE OF CHARLES C. CLIFTON.

APRIL 3, 1928.

REHEARING DENIED DECEMBER 14, 1928.

*Livingston & Eicher, Clearman & Olsen,* and *Morrison & Morrison,* for appellants.

*Roberts & Roberts* and *Brookhart Bros.,* for appellees.

MORLING, J.—Stated in general terms, the principal question argued is whether Clarence took a transmissible right of property or interest in the trust estate. In our view of the case, it is necessary to consider only three questions: One and two (inseparable), whether the devise over if Clarence died "without leaving any heirs" is limited to the event of his death in testator's lifetime, and whether testator used the word "heirs" in its technical sense, or in the limited sense of descendants or heirs of the body. Three, it being assumed that the devise to Clarence was or might be of the absolute equitable or legal ownership, whether such ownership was base, qualified, or terminable. The will of Charles C. Clifton provided in the first clause for payment of debts. The second clause was a bequest of one third of the estate to the widow, Martha E. Clifton. The controversy relates solely to the third clause, which reads as follows:

"The remaining two thirds to be left in trust, in the hands of my executor hereafter named, for my son, Clarence C. Clifton, who is inclined to let money slip through his hands and I want him provided for till he has reached an age where he can make good use of the estate. If the executor thinks he is capable of taking care of his money without losing it, then he can have the use of it. If not capable it must still be kept in trust for him. In case the executor named should die or resign, I then ask the court to appoint some good reliable farmer that would be acceptable to my son, Clarence. I request that the banking business be done through the Washington National Bank. And I want Brookhart Bros. for legal advisers when needed.

"If my son, Clarence, dies without leaving any heirs I then want the remaining part of my estate left in trust to some old ladies' home that is located in Iowa, nearest to Washington, Iowa.

"I appoint Fred E. Palmer of Washington County, Iowa, my executor with bonds."

Testator was married three times. His first wife (May Lauder) died in 1894, a few days after the birth of Clarence C. Clifton, their only child. The second marriage terminated by the death of the wife. The third marriage took place February 29, 1912, the wife by that marriage, Martha E., surviving testa-

tor. There were no children by the second or third marriage. Clarence made his home with his father until his father's death, which was December 24, 1916. The father's will is dated April 10, 1914. Testator's age is not shown, but his widow, at the time of the trial, was 75. The widow's testimony is that Clarence "was not a rugged or strong boy. * * * He never had done any farm work. He went to school some. * * * In some things he was not just as bright as he might have been, but in other things he was just as normal as anyone. He was good-natured and easily influenced. * * * My husband was never at any time away visiting with relatives of Clarence's mother during the period of time we were married. I never saw them, only Charles Lauder, the one time. Never did my husband during our married life go to visit with any of Clarence's relatives on the mother's side. He never visited them, and they never visited him, 'except one occasion, when Charles Lauder was there.'"

She testified that they "were in a way friendly, but never corresponded. Mr. Clifton cared nothing at all for the family." No mail came from them. The testimony of testator's brother, W. H. Clifton, who lived in testator's vicinity, shows that he and testator and a sister, who died after the making of the will, were very intimate; that he and testator associated together continuously; that they talked over their relationships to some extent.

"We might have mentioned our relatives in a casual way, but I don't ever think we did. We both knew we both had relatives."

Testator was the only one of his father's children who married. Testator had a large number of collateral relatives. The claimant Charles E. Lauder lived at Monmouth, Illinois, Mrs. Haw in Ottumwa, Iowa, Mrs. Powell in Kansas City, Missouri. Charles E. Lauder, testifying in behalf of himself and his sisters, gave the names of six brothers and sisters of Clarence's mother, five of whom were living. One of those living had four or five children. One sister had died (he says), "if I remember rightly, leaving children. I couldn't name those children, but I think there were three or four. The last I heard of them, they resided in Des Moines, Iowa. That was two or three years ago."

Charles has three children; Mrs. Haw one. Charles did not

testify, nor was there any further evidence regarding the social relationship between Charles C. Clifton or Clarence and the first wife's relatives.

The record does not show where Clarence lived after his father's death. Clarence made a will dated March 4, 1925, in which he described himself as being of Kansas City, Missouri. By a separate section of the will, Clarence recited that he had an estate in Washington, Iowa, left to him by his father in trust, of which F. E. Palmer was trustee, amounting to some $12,000 or $13,000, and bequeathed it to Mrs. Carrie M. Powell, Mrs. George Haw, and Charles E. Lauder. Clarence died in September, 1925.

The Mary O. Coldren Home for Aged Women has been in operation at Iowa City, Iowa, since 1908, accommodating an average of twelve women. The Washington Home, of Washington, Iowa, was incorporated August 27, 1925. It has never been in operation.

The testator was a farmer all his life, except that he at one time lived in Washington, Iowa, engaged in the ice business and restaurant business. The will was drawn by his third wife.

The final report of the trustee, F. E. Palmer, filed March 15, 1926, in the district court of Washington County, showed on hand for distribution $11,286.60.

The contention in behalf of Clarence's legatees is, in substance, that the two-thirds interest bequeathed to Clarence vested in him "at the testator's death, subject only to a temporary possession in the trustee during the lifetime of Clarence. * * * That, if said two thirds did not at said time vest in Clarence, * * * it did vest absolutely in Clarence's heirs and beneficiaries at the death of Clarence, at which time the trust terminated."

They also argue that:

"If Clarence died intestate, leaving no direct heirs, then said two thirds should go to some old ladies' home. It is evident that the testator intended that said two thirds should go either to Clarence absolutely, with possession and control deferred, or to some old ladies' home. * * * If the testator's only thought was to have his son Clarence properly provided for, and to give him no other or greater interests, if he died without heirs, then it would seem to have been the clear intention of the testator that

dying without heirs meant dying without children or heirs of his body. If dying without heirs meant dying before testator's death, that would have necessarily meant children or heirs of his body, because the testator was bound to know that he would have been the sole heir of Clarence, and Clarence could not have died without heirs. * * * We think the fact that, in connection with the clause 'dies without leaving any heirs,' he does not mention his brother or any collateral heirs, but does mention some old ladies' home, cannot be reconciled with the thought that he intended to give said two thirds to his collateral heirs.''

Though trite and monotonous reiteration to say so, it must be held constantly in mind that the object of testamentary interpretation is to ascertain the purpose of the testator, and when ascertained, to give it effect, if this can be done without violating any settled rule of law. In the search therefor, the court must, as nearly as it can, take its position in the environment of the testator, and in the light of the facts known to him, and in which he wrote the will.

I, II. Does the clause ''if my son Clarence dies without leaving any heirs'' mean Clarence's death in testator's lifetime, or does it extend to the event of his death after that of testator, without leaving heirs; and, inseparable from this question, does the word ''heirs'' mean heirs at law in the technical sense, or is it the equivalent of heirs of the body, or descendants? It is manifest that testator could not have intended the clause in question to mean death in testator's lifetime and at the same time intended the word ''heirs'' in its technical sense of ''heirs at law.'' If the intention of testator was to limit the devise over to the event of death in his own lifetime, then necessarily Clarence would not die without leaving any heirs in the technical sense, for testator would himself be the heir. Conversely, he could not have intended the word ''heirs'' in its technical meaning and at the same time have intended the devise over to him to be limited to the event of Clarence's death in his lifetime. Either limitation to the event of death in testator's lifetime, or technical interpretation of the word ''heirs,'' or both, must be rejected.

Furthermore, testator could not have intended merely a devise over in the event of Clarence's dying in his lifetime; for

the provision made for Clarence had reference to Clarence's personal incapacity to take proper care of his property, and the devise was to a trustee for Clarence. Testator could not have had in mind similar characteristics in Clarence's heirs and the necessity of making a trust for them. The provision for Clarence was by way of trust. Clarence, at the time the will was drawn, was only 20 years old, unmarried. He was deficient mentally and physically. Whether he would outgrow his weaknesses, would marry, and have children, and, if so, when such events would happen, were wholly conjectural. The provision for Clarence was made in view of his personal characteristics. It cannot be assumed that, if he left heirs, the testator intended these same limitations to apply to their enjoyment of the property.

The will was drawn by a layman (testator's wife), and its language should be interpreted as layman's language. The natural lay interpretation that would be placed upon the provision is that, whenever the ultimate event of Clarence's death, which was bound to happen at some time, should occur, if he then left no heirs, the remaining part of the estate should go "in trust to some old ladies' home." The language of the clause under consideration implies the event of Clarence's death after having enjoyed the bequest made for him, and therefore after testator's death. The case is not one merely of a plan of distribution, nor of a devise *simpliciter* of a fee, or of the absolute estate or property in the subject of the devise. In the case of a mere plan of division, or of a simple devise of the absolute property in the subject of the gift, the testator is presumed, by his reference to the death of the beneficiary, to mean death in his lifetime. *Caslavka v. Caslavka,* 194 Iowa 52; *Atchison v. Francis,* 182 Iowa 37; *Blain v. Dean,* 160 Iowa 708; *Tarbell v. Smith,* 125 Iowa 388; *Williams v. Allison,* 33 Iowa 278; *Guilford v. Gardner,* 180 Iowa 1210; *Collins v. Collins,* 116 Iowa 703.

Where the natural interpretation of the will as a whole is that the event of the devisee's death which the testator had in mind was death during or after his own lifetime; where the provision for substitution is annexed to the substance of the gift; where it may fairly be presumed that testator had in mind a future marriage and birth, and the intention of keeping the property in his family; where the gift to the first taker is quali-

fied, not *simpliciter* of an absolute estate; "but when the death of the first taker is coupled with other circumstances which may or may not ever take place, as, for instance, death under age, or without children, the devise over, unless controlled by other provisions of the will, takes effect, according to the ordinary and literal meaning of the words, upon death, under the circumstances indicated, at any time, whether before or after the death of the testator. *O'Mahoney v. Burdett,* above cited [L. R. 7 H. L. (Eng. & Irish App. Cas.) 388, 395]; 2 Jarman on Wills, Ch. 49." *Britton v. Thornton,* 112 U. S. 526, 533 (28 L. Ed. 816).

See, also, *Guilford v. Gardner,* 180 Iowa 1210, 1220; *Jordan v. Hinkle,* 111 Iowa 43; *Hollister v. Butterworth,* 71 Conn. 57 (40 Atl. 1044); *Summers v. Smith,* 127 Ill. 645 (21 N. E. 191).; *Mullarky v. Sullivan,* 136 N. Y. 227 (32 N. E. 762); *Hutchins v. Pearce,* 80 Md. 434 (31 Atl. 501); *Rees v. Williams,* 165 N. C. 201 (81 S. E. 286); *Smith v. Piper,* 231 Pa. St. 378 (80 Atl. 877); 1 Underhill on Wills, Section 348; *Mead v. Maben,* 131 N. Y. 255 (30 N. E. 98); *Lee v. Roberson,* 297 Ill. 321 (130 N. E. 774); *Ambruster v. "Own Your Home" Assn.,* 97 N. J. Eq. 69 (127 Atl. 167).

The meaning that would commonly be placed upon this will is that, if Clarence should die without heirs, though his death occurred after that of testator, the remaining part of the estate should go in trust to some old ladies' home. The devise to Clarence had regard to his personal characteristics. It was in trust. The trust might continue throughout his life, or the trustee might terminate it and turn the property over to him. Another trustee acceptable to Clarence might be appointed. The devise is not one of a simple fee or absolute property to Clarence. Under well established principles, the event of Clarence's death, in the mind of the testator, must be held to have been that event regardless of whether it occurred before or after his own death.

In what sense did the testator use the word "heirs?" In its technical sense, the word includes collateral relatives to the remotest degree. In popular language, it is often used as meaning "children,"—e. g., the birth of a child is spoken of as the birth of an "heir." One leaving no descendants is spoken of as having died without an "heir." Testator's main concern was to provide for his son, who was young, and who was a physical and mental defective, and whom he considered incapable of taking

care of property. Doubts would naturally occur to him whether such a son, 20 years old, would marry and have children. Testator would doubtless have such a contingency in mind. Clarence was his only son. He would naturally want to keep the property in the line of descent. He naturally also would be concerned for the care of Clarence's children, if he should have any. The circumstances were such, however, as to raise a grave doubt in testator's mind whether Clarence would leave children, or (in the popular sense) "heirs," behind him. In making provision for Clarence's children, he would naturally use, in expressing it, language colored with such doubts. He could have had no doubt, however, about Clarence's leaving "heirs" in the technical sense; and furthermore, while there was reason for allowing his property to go to his own immediate relatives, there was absolutely none, on this record, for his making any provision for his deceased wife's relatives. As the object of the search is to ascertain the testator's intent, it must be assumed that he had an intent. If he intended that his property should go to the technical heirs of Clarence (rather than to his own heirs), it must be assumed that he intended that it should go first to Clarence's descendants. If none, then to testator himself. If testator was not living, then, third, to testator's brother and sister, and to testator's first wife's brothers and sisters, and the descendants of those who were dead. Testator's first wife had been dead 20 years. He had since been twice married. He was out of contact with her relatives. They had no interest in each other. It would appear from the testimony of Charles E. Lauder, one of the claimants under Clarence's will, that even he was quite a stranger to part of his deceased sister's and his own relatives. If we are to assume that testator thought that all of Clarence's uncles and aunts and their descendants on both sides might die before Clarence, then the heirs would be, fourth, the descendants of testator's grandparents and of his first wife's grandparents. One of testator's grandparents had "about twenty children." It is impossible to believe that testator used the word "heirs" in any such sense, or that he would have phrased a devise over that would be so utterly useless if he meant the residuary trust estate° to go to Clarence's technical heirs at law, other than descendants. It should be construed as meaning "heirs of the body," or "descendants." *Kalbach v. Clark*, 133 Iowa 215; *Furenes v. Severt-*

*son,* 102 Iowa 322, 325; *VanDusen v. Sharrar,* 186 Iowa 1082; 40 Cyc. 1461; *Estate of Stambaugh,* 135 Pa. St. 585 (19 Atl. 1058); *Risser v. Ayers,* 306 Ill. 293 (137 N. E. 851); *Lee v. Roberson,* 297 Ill. 321 (130 N. E. 774).

III. It is contended in behalf of Clarence's devisees that Clarence took the absolute equitable ownership, with the possibility of taking legal ownership by termination of the trust.  The adverse contention is that the provision made for Clarence was only by way of a spendthrift trust (see *Meek v. Briggs,* 87 Iowa 610; *Robertson v. Schard,* 142 Iowa 500, 504; *Merchants Nat. Bank v. Crist,* 140 Iowa 308; *Olsen v. Youngerman,* 136 Iowa 404; *Damhoff v. Shambaugh,* 200 Iowa 1155, 1157; *Estate of Stambaugh,* 135 Pa. St. 585 [19 Atl. 1058]; *Graham v. More* [Mo.], 189 S. W. 1186; *Bennett v. Bennett,* 217 Ill. 434 [75 N. E. 339]; *Baker v. Brown,* 146 Mass. 369 [15 N. E. 783]; *Wagner v. Wagner,* 244 Ill. 101 [91 N. E. 66]); that no transmissible ownership, legal or equitable, ever vested in Clarence.

We may premise that while, so far as appears, personal property in the form of a trust of money only seems to be involved, the parties, very properly we think, seek to make no distinction between the rules governing the creation and transmission of interests in real estate and those in personal property. The statute of perpetuities is not violated, nor is the estate under consideration such that, if it were in real property, it would be an estate tail at common law. The law applicable to real property by analogy applies, and its principles govern, with respect to the trust fund under consideration here. 21 Corpus Juris 1023, 1027, 1042, 1043; 11 Ruling Case Law 473; *Braswell v. Morehead,* 57 Am. Dec. 586; *Blackstone v. Althouse,* 278 Ill. 481 (116 N. E. 154, L. R. A. 1918B 230); *Sherley v. Sherley,* 192 Ky. 122 (232 S. W. 53). We have applied the same principles to both real and personal property. *Phelps Mtg. Co. v. Thomas,* 194 Iowa 1078. We may here use the terminology of real property law. Though the proceeding is in probate, the court has equitable jurisdiction, and will be governed by equitable principles. *Mock v. Chalstrom,* 121 Iowa 411.

We do not feel called upon to determine the precise nature of the estate which Clarence possessed in his lifetime. He died without coming into the legal estate. Testator, however, made

provision for the termination of the trust and the union of both the legal and equitable estates in Clarence. Though the event did not happen, the provision made by testator for it must be kept in mind in the effort to discover the purpose of the will. We have interpreted testator's intent to be that, if Clarence died after the will came into operation, without leaving heirs of his body, the substitutionary devise would come into effect. The bequest of the legal and equitable estate to Clarence was conditioned on his leaving heirs of his body or descendants at the time of his death. Conversely stated, on Clarence's death without bodily heirs, the remaining part of the estate was given "in trust to some old ladies' home." The fee given to Clarence was limited, conditional, determinable,—a base or qualified fee (ownership). The event on which it was conditioned has occurred. The substitutionary devise in favor of "some old ladies' home" has come into operation. *Guilford v. Gardner,* 180 Iowa 1210; *Phelps Mtg. Co. v. Thomas,* 194 Iowa 1078; *Olson v. Weber,* 194 Iowa 512; *Vaughn v. Converse,* 184 Iowa 891; *Jordan v. Hinkle,* 111 Iowa 43; *Stubbs v. Abel,* 114 Ore. 610 (233 Pac. 852); *Staack v. Detterding,* 182 Iowa 582; *In re Estate of Darr,* 114 Neb. 116 (206 N. W. 2); *Drager v. McIntosh,* 316 Ill. 460 (147 N. E. 433); *Lee v. Roberson,* 297 Ill. 321 (130 N. E. 774); *Ambruster v. "Own Your Home" Assn.,* 97 N. J. Eq. 69 (127 Atl. 167); *Mead v. Mabin,* 131 N. Y. 255 (30 N. E. 98); *Smith v. Piper,* 231 Pa. St. 378 (80 Atl. 877); *Atkinson v. Kern,* 210 Ky. 824 (276 S. W. 977); *O'Malley v. O'Malley, Jr.,* 20 Ohio App. 279 (151 N. E. 795); *Pugh v. Allen,* 179 N. C. 307 (102 S. E. 394); *Farmers' & Merch. Bank v. Hammond,* 172 Ark. 1065 (291 S. W. 823); *Duval v. Duval,* 316 Mo. 626 (291 S. W. 488); *Wiggins v. Hill,* 145 Ark. 152 (223 S. W. 394).

In *Meek v. Briggs,* 87 Iowa 610, while a similar will was held to create a spendthrift trust for the beneficiary, the death of the *cestui que trust* before transfer of the estate to her was held to terminate the trust and to vest the estate in her heirs. That case was not one of failure of heirs and limitation over, as here. The same is true of *Toner v. Collins,* 67 Iowa 369.

Two homes have filed answers to the trustee's final report, asking for the funds. Neither of them is named in the will, nor has any property rights by the terms of the will. Each is merely

a voluntary candidate. The will does not designate any home, nor the qualifications required, except that it is to be "located in Iowa nearest to Washington, Iowa." Nevertheless, a substantial home must be held to have been intended, not merely a paper organization, nor an organization which, because of debt, lack of financial resources, proper facilities, equipment, or sanitary conditions, or which by reason of its connections and patronage or lack thereof, or its physical, moral, or social surroundings, or by reason of other matters, would be merely ephemeral, or would not be an "old ladies' home" in a substantial sense. Discretion was reposed in the trustee and court. Search and investigation accordingly should be made. This has not been done. Neither of these claimants has been investigated or selected, and neither in this proceeding is entitled to be awarded the fund. We here hold that, while the answers of the two old ladies' homes are not improperly filed, in that one of them may ultimately be selected, and they may for that reason now be heard on the proper interpretation of the will, still their affirmative demands are premature. Whether either of them may finally be found entitled to the fund is withheld from adjudication. These claimants' rights are not to be construed as adjudicated in this proceeding, but are left open for future determination. *Harrison v. Hartford Fire Ins. Co.*, 102 Iowa 112; *Scribner v. York*, 89 Iowa 737; *Christie v. Iowa Life Ins. Co.*, 111 Iowa 177; *McCullough v. Connelly*, 137 Iowa 682.

One of the arguments suggests the question whether the old ladies' home is entitled to more than one fourth of the testator's estate, under Section 11848, Code of 1924, and its predecessor statutes. As neither of the answering homes is now entitled to the residue, and the question is not argued, it is not decided.— *Reversed.*

FAVILLE and ALBERT, JJ., concur.

DE GRAFF, J., concurs specially.

WAGNER, J., not participating.

STEVENS, C. J., and EVANS and KINDIG, JJ., dissent.

DE GRAFF, J. (specially concurring).—I concur in the reversal of this case, but would respect the statutory limitation on

disposal of property by a will (Section 11848, Code of 1927), and would reverse with direction to the trial court to determine on the facts what particular old ladies' home, if any, is qualified to take the bequest, subject to the statutory limitation.

The trust created in the will of Charles C. Clifton is an ordinary trust, with the legal fee simple in the trustee named, and an equitable fee simple in Clarence, with the equitable fee simple subject to an executory gift over to an old ladies' home on a definite failure of issue (heirs of the body) of Clarence at the time of the death of Clarence. Had Clarence left issue, the trust would have terminated at his death, since there would have been nothing left for the trustee to do. When the trust came into being, it was an active trust, and upon the death of Clarence (had he had issue surviving), it would have become a dry trust, and executed as such under the Statute of Uses, which must be viewed as adopted in principle in this state as a part of our common law.

As a matter of legal nomenclature, the equitable fee in Clarence could be called a base or qualified equitable fee, although in a strict sense that term is applied to legal estates. However, the result is the same.

I would not refer the proviso in the will to the testator's death, as that would extend a rule of doubtful construction. In my opinion, the legal fee is in the trustee, and continued in him. This thought is supported by the language of the testator in his will:

"If my son Clarence dies without leaving any heirs, I then want the remaining part of my estate left in trust to some old ladies' home," etc.

The word "left" must be construed to mean "to be allowed to continue." This construction carries out the testator's intention, which is the quest in the instant case.